**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Mary Margaret Ruff, f/k/a Mary Margaret Nunez, Appellant,

v.

Samuel Nunez, Jr., Respondent.

Appellate Case No. 2011-190306

———————————

Appeal From Greenville County
Billy A. Tunstall, Jr., Family Court Judge

———————————

Unpublished Opinion No. 2013-UP-290
Submitted May 1, 2013 – Filed June 26, 2013

———————————

**AFFIRMED IN PART AND MODIFIED IN PART**

———————————

Dianne S. Riley, of Greenville, for Appellant.

Bruce Wyche Bannister, of Bannister & Wyatt, LLC, of Greenville, for Respondent.

———————————

**PER CURIAM:** Mary Margret Ruff and Samuel Nunez Jr., formerly wife and husband, shared joint custody of their child Gabriel, with Nunez having primary placement. In 2009, Ruff sought sole custody, child support, and other relief, arguing a substantial change in circumstances had occurred that affected Gabriel's welfare. The family court's final order denied many of her claims, including her

request for sole custody.  We affirm the family court's custody determination, affirm in part the court's holiday visitation schedule and modify it as it relates to Ruff's Christmas and spring break visitations, and affirm the court's other findings and legal conclusions.

## I.      Facts and Procedural History

Ruff and Nunez married in 2000, and Gabriel was born a year later.  In 2006, they divorced and agreed to share joint custody of Gabriel, with Nunez receiving primary placement.  In April 2009, Ruff filed an *ex parte* motion for emergency relief, alleging a substantial change in circumstances and seeking sole custody, supervised visitation, child support, and other relief.  Specifically, Ruff claimed a substantial change of circumstances occurred when Nunez (1) went to New Jersey for two months in the spring of 2009, (2) left Gabriel in her care during this time without support and without medical insurance, (3) failed to inform her of his whereabouts, and (4) later informed Ruff he wanted Gabriel to move to New Jersey with him.

Following an emergency hearing, the court issued a temporary order, awarding the parties (1) joint custody, with Ruff receiving primary placement during the school year and Nunez having primary placement during the summer, (2) child support to both parties for the period of time they had primary placement, and (3) visitation for both parties when they did not have primary placement.  The order also enjoined Ruff from using alcohol in Gabriel's presence and ordered both parties to give Gabriel his prescribed medications for attention deficit hyperactivity disorder (ADHD) until he could be evaluated by a physician.

In February 2010, the family court found Ruff in contempt for consuming alcohol in Gabriel's presence.  Again in September 2010, the court found Ruff in contempt for having alcohol in her home while Gabriel was present.  As a result of these two violations, the court granted Nunez temporary sole custody, and Gabriel moved to New Jersey.  A month after Gabriel relocated to New Jersey, the family court issued a Rule to Show Cause order requiring Nunez to "immediately restart [Gabriel's ADHD] medicine."  However, the court subsequently dismissed the action because Gabriel was taken off his medication pursuant to his physician's recommendation.

The family court held a two-day trial in January 2011.  In its final order, the court found Ruff and Nunez should continue to enjoy joint custody, with primary placement remaining with Nunez.  Specially, the court found Ruff did not prove a

substantial change in circumstances affecting the best interests of the child because Nunez's move to New Jersey was in Gabriel's best interests. The court explained Nunez was in a better position to care for Gabriel in New Jersey than in South Carolina, and his home and job were stable.

The court, however, noted that even if Ruff proved a substantial change in circumstances, it "would not be justified in changing the custody arrangements" due to Ruff's current circumstances. The court reasoned "nothing ha[d] changed from the final order as it relates to [Ruff]" because she continued to change jobs on a regular basis, lacked stable housing, and depended on her current boyfriend to pay bills. The court went on to find her conduct to be "self-serving and for the purpose of gaining an advantage in the [custody] action." As to issues relating to Gabriel's ADHD medication, the court found Ruff (1) used Gabriel's ADHD medication issues "as an offensive weapon" against Nunez to discredit him and "sway the [GAL] to support her [custody] action," (2) had not cooperated in having prescriptions filled or paid medical bills in a timely fashion, and (3) had frustrated Nunez's attempts to seek advice from medical professionals regarding Gabriel's ADHD medication. In response to Ruff's contention that she does not have an alcohol problem, the court found Ruff offered "no witnesses who would acknowledge [her] problem with alcohol; instead, [she] chose to offer testimony of witnesses who minimized her selfish and irresponsible behaviors." Regarding issues relating to visitation, the court found Ruff uncooperative in scheduling visitation with Nunez, which "increased the cost of this litigation, . . . contributed to the anxiety and stress [of Gabriel], and has not been in the best interest of the child." Finally, the court noted Ruff is unemployed and drinks on a regular basis and has refused to provide medical and dental treatment for Gabriel. Accordingly, the court denied Ruff's request for sole custody.

As to Gabriel's medical care, the court ordered Nunez to make all medical decisions related to Gabriel, finding Nunez had "exhibited sincere concern" and gone to "extraordinary lengths" to assure Gabriel received appropriate medical care. Additionally, the court ordered the parties to equally divide all uncovered medical expenses relating to Gabriel. Regarding outstanding medical bills, the court ordered Nunez to pay Ruff $48 for medical expenses she had previously paid but had not been reimbursed for.

As to visitation, the family court set forth a minimum visitation schedule but explained the "parties may at any time deviate from [the schedule] . . . as they may agree." The schedule provided Ruff with visitation once a month—coinciding with Gabriel's school holiday schedule—and visitation over the summer. As to

visitation-related costs, the court ordered Ruff to pay the transportation costs of her visitation and to fly Gabriel into and out of Newark Liberty International Airport. Likewise, the court ordered Nunez to pay the transportation costs for his two weeks' visitation over the summer and to fly Gabriel into and out of Charlotte Douglas Airport.

The family court also set forth a holiday visitation schedule, which provided Nunez visitation for Easter each year, Thanksgiving break during odd-numbered years, and Christmas vacation during even-numbered years. Ruff received visitation for Thanksgiving break during even-numbered years and Christmas vacation during odd-numbered years, with visitation beginning on December 26 and thus not including Christmas Eve or Christmas Day. Ruff also received visitation for Gabriel's spring break each year, but the court ruled that if Gabriel's spring break fell on the same week as Easter, Ruff's visitation would be cut short by three days so that Gabriel could be with Nunez for Easter.

In regard to issues raised concerning the parties' ability to contact Gabriel when he was in the other party's custody, the court set a phone schedule. The court ordered the party with primary placement to provide a minimum of one call per week from Gabriel to the party without physical placement. The court provided, however, that the parties must make reasonable arrangements to allow Gabriel to talk on a more frequent basis than once a week.

As to the alcohol-related restrictions on Ruff, the court noted Ruff had an ongoing problem refraining from the use of alcohol in front of Gabriel. Therefore, the court found the alcohol restrictions should continue. Specifically, the order provided Ruff could not possess alcohol in her home or consume alcohol when Gabriel was in her presence and care.

Regarding child support, the family court ordered Ruff to pay $475 per month in child support and retroactive child support for a total of six months that Nunez had physical custody of Gabriel. Although Ruff testified she currently had no income because she was unemployed, she also testified she was expecting to receive unemployment benefits after the trial ended on January 6, 2011 and was currently looking for employment. Based on this testimony, the court found Ruff's "unemployment benefits shall begin or [she] will have employment by the end of January, 2011." Moreover, the court imputed income to Ruff consistent with the income she received prior to losing her job. The court justified the imputation of income because Ruff (1) "is able[-]bodied and capable of earning a living equal to

her income prior to the beginning of th[e] action," and (2) was employed during the pendency of the action, except for a short period of time before and during the trial.

With regard to the GAL's fee, the family court ordered Ruff to pay the entire fee because Ruff's "behavior resulted in a substantial balance due to the [GAL]." The court explained that "the length of time this matter was pending [wa]s a direct result of [Ruff]'s actions," and her child custody action was ultimately unsuccessful.

## II.    Issue on Appeal

Ruff asserts on appeal the family court erred in making findings and conclusions that were against the preponderance of the evidence—or in not making any findings or conclusions as to "crucial" facts—when the court:

(1) Denied Ruff's request for sole custody;
(2) Continued to enjoin Ruff from consuming or possessing alcohol in Gabriel's presence;
(3) Ordered holiday visitation;
(4) Ordered Ruff to pay transportation costs for her visitation;
(5) Ordered Ruff to obtain unemployment benefits or employment by the end of January 2011;
(6) Imputed income to Ruff at the previous level she was paid before she became unemployed;
(7) Ordered Ruff to pay retroactive child support;
(8) Ordered Ruff to pay half of Gabriel's uncovered medical expenses;
(9) Ordered Nunez to reimburse Ruff $48 for Gabriel's outstanding medical bills;
(10) Set a telephone contact schedule;
(11) Granted Nunez the exclusive right to make all medical decisions related to Gabriel; and
(12) Ordered Ruff to pay the GAL's fee in full.

We address each issue separately.

## III.    Standard of Review

On appeal from the family court, our standard of review is *de novo*. *Argabright v. Argabright*, 398 S.C. 176, 179, 727 S.E.2d 748, 750 (2012). Therefore, we may find facts in accordance with our view of the preponderance of the evidence. *Id.*

However, we are not required to disregard the family court's findings and "should give great deference to [them] where matters of credibility are involved." *Pirayesh v. Pirayesh*, 359 S.C. 284, 292, 596 S.E.2d 505, 510 (Ct. App. 2004). This is especially important when cases involve the welfare and best interests of the child. *Latimer v. Farmer*, 360 S.C. 375, 380, 602 S.E.2d 32, 34 (2004).

**IV.  Issues Raised By Ruff**

**1.  Custody**

"In a custody dispute, the paramount and controlling factor is the welfare and best interests of the child." *Patel v. Patel*, 359 S.C. 515, 526, 599 S.E.2d 114, 119 (2004) (quoting *Matthews v. Matthews*, 273 S.C. 130, 132, 254 S.E.2d 801, 802 (1979)). When determining whether a change in custody is warranted, the analysis centers on whether the transfer of custody is in the child's best interests. *Latimer*, 360 S.C. at 381, 602 S.E.2d at 35. When a non-custodial parent seeks a change in custody, that parent must establish: "(1) there has been a substantial change in circumstances affecting the welfare of the child and (2) a change in custody is in the best interests of the child." *Id.* A change in circumstances justifying a change in custody means "sufficient facts have been shown to warrant the conclusion that the best interests of the child[] would be served by the change." *Spreeuw v. Barker*, 385 S.C. 45, 59, 682 S.E.2d 843, 850 (Ct. App. 2009).

"A change in the custodial parent's residence is not in itself a substantial change in circumstances affecting the welfare of the child[] that justifies a change in custody." *Walrath v. Pope*, 384 S.C. 101, 105-06, 681 S.E.2d 602, 605 (Ct. App. 2009); *see also Latimer*, 360 S.C. at 382, 602 S.E.2d at 35 ("We decline to hold relocation in itself is a substantial change in circumstances affecting the welfare of a child."). Relocation is only one factor to consider, and "[i]t should not be assumed that merely relocating and potentially burdening the non-custodial parent's visitation rights always negatively affects the child's best interests." *Latimer*, 360 S.C. at 382, 602 S.E.2d at 35. In determining whether a child's best interests are served by relocation, our supreme court has considered the following factors: (1) the potential advantages of the relocation; (2) the likelihood the move will improve the quality of life for the custodial parent and child; (3) the integrity of the motives of both parents in seeking the move or seeking to prevent it; and (4) the availability of a realistic substitute visitation arrangement that will foster an ongoing relationship between the non-custodial parent and child. *Latimer*, 360 S.C. at 384-85, 602 S.E.2d at 36-37.

We find Nunez should continue to enjoy primary placement of Gabriel, despite his relocation to New Jersey. Ruff asserts a substantial change in circumstances affecting Gabriel's welfare occurred when Nunez (1) went to New Jersey for two months in the spring of 2009, (2) left Gabriel in her care during that time without support, (3) failed to inform her where he was or when he would return to South Carolina, and (4) later informed her he wanted Gabriel to move to New Jersey with him. However, Nunez contradicted many of these allegations at trial. He testified that while in New Jersey, he contacted Ruff on a daily basis and gave her information regarding his whereabouts. He also testified he did not abandon Gabriel without support because he continued to pay for daycare and medical insurance for Gabriel.[1] The court explicitly found Nunez's testimony "regarding his family support to be credible."

Also, pursuant to the factors considered in *Latimer*, the relocation to New Jersey is in Gabriel's best interests. Although the court did not delineate its consideration of the *Latimer* factors in its order, by our own view of the preponderance of the evidence, we believe Gabriel's relocation to New Jersey is in his best interests.[2] First, as to the integrity of the parties' motives in seeking to move or challenge the

_____

[1] The exhibit submitted by Nunez only showed he made payments to Gabriel's daycare through April 2007, which is not relevant to whether Nunez made payments when he went to New Jersey during the spring of 2009. We believe this exhibit neither proves, nor disproves, that he did not make payments to the daycare. There is evidence, however, that Nunez did allow Gabriel's medical insurance to lapse during this two-month time period, but Nunez has since maintained insurance for Gabriel. All this evidence was before the family court when it made its determination, and we believe the court appropriately weighed the evidence in making its custody decision.

[2] The *Latimer* court did not endorse or specifically approve one set of factors; rather, the court set forth the various factors used by New York and Pennsylvania state courts. 360 S.C. at 382-83, 602 S.E.2d at 35-36; *see also Walrath*, 384 S.C. at 106, 681 S.E.2d at 605 (explaining our supreme court "has acknowledged, without endorsing or specifically approving," factors that other states consider when making a relocation custody determination). Ruff asserts the court erred in not enumerating the factors required to be considered in making a custody determination, but because our supreme court has not specifically approved a set of factors, we find this argument unpersuasive.

move, we believe both parties' motives are legitimate. Nunez testified he moved to New Jersey to attend college and ultimately become a teacher because he was laid off[3] from his job in South Carolina. Thus, his motive is based on an intent to improve his education and financial situation, which positively affects Gabriel's best interests. As to Ruff's motives, we believe she opposed the move because she was surprised by Nunez's decision to relocate, and she desired regular and meaningful contact with Gabriel. Ruff testified she and Nunez agreed they "would be together . . . where it wouldn't make it impossible for [them] to . . . see [Gabriel] all the time regularly." Ruff stated Nunez told her in the middle of March 2009 that he was not planning to move to New Jersey, but at the end of March, he informed her he intended to move to New Jersey and take Gabriel with him. Additionally, the GAL testified she did not believe Ruff was trying to get back at Nunez in any way by filing the action. Based on these facts, we believe both parties' motives are legitimate, so this factor does not affect either party negatively in the overall custody determination.

Second, the advantages to Gabriel of Nunez's relocation appear to weigh in Nunez's favor. The family court found Nunez's relocation resulted in him being in a better position to care for Gabriel. Nunez stated his work schedule at his previous job was sixty hours per week, but now his work and school schedule allow him to be home when Gabriel gets home from school. Moreover, whenever he has a scheduling conflict, Nunez's relatives are available to watch him. It also appears Nunez has substantial family ties in New Jersey because approximately twenty-four of his relatives live within five miles of his home. While Ruff contends the court ignored the fact that Gabriel also has close family members residing in South Carolina, the existence of this fact does not mean the move was not in Gabriel's best interest, and the court appropriately exercised its discretion in weighing the evidence presented on this issue. Additionally, Ruff testified Gabriel attends church with Nunez and was baptized at this church. Overall, we find this factor weighs in Nunez's favor because (1) Nunez is employed and pursuing an education that will increase his earning potential; (2) Nunez and Gabriel have a strong support system and stable family environment in New Jersey; and (3) Nunez

---

[3] Although Nunez testified he was "laid off," there is evidence in the record showing he was terminated for cause. Ruff argues his dishonesty with the court on this issue is one of many "proven facts" affecting the resolution of the custody issue because it is "directly relevant to [Nunez]'s lack of responsibility and credibility." We disagree and believe many of the facts she alleges as "proven" and "crucial" were in fact disputed and minimal in the overall determination.

has assumed the responsibility for Gabriel's moral upbringing by taking him to church each week.

Third, we find Nunez's relocation will substantially improve his and Gabriel's quality of life. First, for the reasons stated above, we believe this factor favors Nunez. Second, Ruff's use and possession of alcohol around Gabriel—in violation of the family court's order—weighs in Nunez's favor. Finally, Gabriel has a difficult time adjusting to change because he suffers from ADHD and oppositional defiance disorder (ODD). Because Gabriel is seeing a new therapist for his ODD in New Jersey, attending church and school there, and participating in extracurricular activities, we think it is in his best interests to remain in New Jersey, where he has lived since September 2010.

Finally, as to the availability of a realistic substitute visitation arrangement, the family court's order encourages both parties to work together to ensure each parent receives reasonable visitation. The family court set forth a minimum visitation schedule, which gives Ruff physical placement during Gabriel's summer break, and one weekend per month visitation coinciding with Gabriel's holiday schedule at school. Additionally, the family court set a monthly and holiday visitation schedule and ordered the parent with physical placement to provide at least one call per week to the parent without physical placement. The court noted that because "electronic communication . . . has been a challenge for [the parents]," the parties were encouraged to "use other forms of communications to allow the party who does not have physical placement . . . to enjoy a close and loving relationship with [Gabriel] while they are apart." Although Ruff contends Nunez's relocation to New Jersey makes their agreement regarding visitation unworkable, it appears Ruff has the opportunity to maintain a close relationship with Gabriel through visitation, telephone contact, and other forms of communication. Therefore, we find this factor favors Nunez.

Based on the above analysis, we find Gabriel's relocation to New Jersey is in his best interests. Ruff argues, however, that the court ignored testimony and evidence that was favorable to her and decisive on the issue of custody. First, she claims the court failed to consider the GAL's testimony and report as it relates to custody. "The role of the guardian ad litem in making custody recommendations is to aid, not direct, the court. Ultimately, the custody decision lies with the trial judge." *Shirley v. Shirley*, 342 S.C. 324, 339, 536 S.E.2d 427, 435 (Ct. App. 2000). Although the GAL's report contradicted some of Nunez's testimony, it ultimately found both parents equally suitable to care for Gabriel, which is not inconsistent with the court's decision to allow Gabriel to remain in Nunez's custody. Also, we

disagree that the court "ignored" the GAL's testimony because the order stated the ruling was based on "the testimony of the parties and their witnesses, and . . . the evidence submitted at trial." We believe the court gave proper weight and consideration to the recommendation when determining the custody issue.

Second, Ruff claims the court ignored evidence that allegedly showed Nunez exhibited financial and moral irresponsibility, violated two court orders regarding Gabriel's medication, and falsely represented certain facts to the court. Once again, we disagree that the court ignored evidence that was before it when it made its determination. Also, because we lack the opportunity to directly observe the witnesses, we "should give great deference to the family court's findings where matters of credibility are involved." *Pirayesh*, 359 S.C. at 292, 596 S.E.2d at 510. Considering Ruff's own misconduct that is highlighted in the court's order—her two violations of the temporary order's restrictions regarding alcohol, her loss of custody due to these violations, the finding that her conduct throughout litigation was "self-serving and for the purpose of gaining an advantage in the [custody] action," and the finding that her behavior increased the cost of litigation—we find the court properly weighed the evidence and correctly decided the custody issue.

We also disagree with Ruff's contention that the family court did not make specific findings regarding Gabriel's best interests and the parties' character, fitness, and attitude as they impact Gabriel. *See High v. High*, 389 S.C. 226, 244-45, 697 S.E.2d 690, 699 (Ct. App. 2010) (stating in making a custody determination, "the family court should consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the children"). The order contains clear credibility and fitness determinations regarding both parties. In fact, the order dedicates three and a half pages to explaining why it should not grant custody to Ruff, even if she proved a substantial change in circumstances.

However, we are inclined to agree that there is no evidence in the record to support the family court's finding that Ruff was uncooperative in scheduling visitation while Nunez was in New Jersey. The GAL's report provided "[Ruff] has cooperated with [Nunez]'s visitation in New Jersey," and Nunez did not testify to the contrary. Thus, the only evidence in the record on this point contradicts the finding that Ruff was uncooperative. Although we find there is no evidence in the record to support this finding, and thus cannot affirm it, we do not believe it changes the overall determination as it relates to custody.

Based on the foregoing discussion, we affirm the family court's refusal to grant a change in custody because we find Ruff failed to show (1) there was a substantial

change in circumstances affecting Gabriel's welfare, and (2) a change in custody would be in Gabriel's overall best interests.

## 2. Alcohol Restrictions

Ruff contends the court erred in continuing to enjoin her from possessing or using alcohol in Gabriel's presence because Nunez presented no evidence proving the restriction is warranted. In the alternative, Ruff contends both parties should be subject to a restriction that only limits excessive consumption of alcohol.

We recommend affirming the family court's decision to continue the alcohol-related restrictions. The restrictions are strong but reasonable in light of the history of this case and the evidence presented. At the temporary hearing, Nunez told the court Ruff played drinking games with friends while Gabriel was present. This evidence caused the court to restrain Ruff from consuming or keeping alcohol in her home while Gabriel was in her physical custody. However, the court later found Ruff in contempt for violating this order twice, once for consuming alcohol and once when the GAL conducted an unannounced home visit and found beer in Ruff's garage refrigerator. At trial, a private investigator testified he observed Ruff consuming alcoholic beverages while Gabriel was in her care and then driving after drinking with Gabriel in her automobile on several occasions. Given Ruff's past violations of the temporary order and the evidence presented, we find the continuing alcohol restriction is reasonable and appropriate.

As to her argument that both parties should be restricted from excessive alcohol consumption, the record does not support such a request. Ruff's counsel even conceded at the temporary hearing that Nunez does not have a "drinking problem." In family court, a party seeking a restraining order "must show such facts and circumstances" proving it is warranted. *Calcutt v. Calcutt*, 282 S.C. 565, 572, 320 S.E.2d 55, 59 (Ct. App. 1984). Because Ruff presented no evidence that a restraining order against Nunez is necessary, we deny her request because it would impose an unwarranted restraint upon him.

## 3. Visitation

Ruff argues the family court erred in setting the visitation schedule because the provisions are unfair to her and unsupported by the evidence. Specifically, she contends (1) her Christmas visitation is unfair because she will never get to spend Christmas Eve or Christmas Day with Gabriel; (2) it is unfair that if Easter falls during spring break, Ruff's spring break visitation is shortened by at least three

days because Gabriel must return to New Jersey for Easter; and (3) any holiday visitation time should be in addition to her one weekend per month.

"When awarding visitation, the controlling consideration is the welfare and best interest of the child." *Woodall v. Woodall*, 322 S.C. 7, 12, 471 S.E.2d 154, 158 (1996).  Although we find the majority of the family court's order concerning visitation to be in Gabriel's best interests, we believe the days included in Ruff's Christmas visitation should be modified.  Currently, the final order only provides Ruff with Christmas visitation during odd-numbered years, which begins December 26.  This schedule does not permit Ruff to ever enjoy visitation over Christmas Eve and Christmas Day.  The order did not state why visitation should not include these days, and Nunez puts forth no argument on this point.  We think it would be in Gabriel's best interests if Ruff's Christmas visitation during odd-numbered years included Christmas Eve and Christmas Day because Gabriel shares a loving relationship with both parents.  Accordingly, we modify the order so that Ruff's Christmas visitation begins December 23.

Regarding Easter and spring break visitation, we disagree that Ruff's spring break visitation should be shortened when it coincides with Easter.  The family court gave Nunez visitation for Easter and gave Ruff visitation during Gabriel's spring break.  However, during school years where Easter occurs during Gabriel's spring break, the order shortens Ruff's spring break visitation by at least three days so Gabriel is with Nunez for Easter.  Although we acknowledge Easter is a religious holiday and Gabriel attends church with Nunez in New Jersey, it is important for Ruff to receive the full amount of visitation allotted to her and to also have the opportunity to celebrate Easter with Gabriel.  Accordingly, we modify the court's order so that when Easter coincides with Gabriel's spring break, Ruff's visitation includes Easter.

Ruff's remaining argument is that she should essentially get two visitations per month during the months she has holiday visitation.  However, we believe the family court properly took into account Gabriel's best interests when limiting visitation.  Requiring Gabriel to travel back and forth from New Jersey, as an unaccompanied minor, multiple times in one month may put too much strain on him and adversely impact his education and involvement in extracurricular activities.  Moreover, the family court made additional provisions for alternate forms of visitation, i.e., telephone contact.  Therefore, we affirm this finding.

## 4.     Transportation Costs

Ruff contends requiring her to pay "all transportation costs" is unfair because Nunez is the party who moved away and made the costs necessary.  She argues that if she must pay transportation costs, she should be allowed to use the most economical means of transporting Gabriel.

We find the family court correctly determined this issue.  Initially, we note Ruff mischaracterizes the family court's order because she contends it is unfair for her to be responsible for paying *all* travel costs.  However, the court ordered Ruff to pay only the travel costs associated with her own visitation; Nunez remains responsible for his visitation costs during the summer, when Ruff has primary custody of Gabriel.  Second, the family court set forth which airports each parent is required to fly Gabriel into and out of because it found "visitation has been an ongoing irritant between the parties during the pendency of this action."  The order only indicates which airports each parent must use and does not prohibit Ruff from using discounts or certain airlines.  Thus, she may still use the most economical means of transporting Gabriel, provided she flies him into and out of Newark Liberty International Airport.   For these reasons, we disagree with Ruff's argument on this issue and affirm the family court's ruling.

## 5.     Unemployment Benefits or Employment

The court found Ruff's "unemployment benefits shall begin or [she] will have employment by the end of January 2011," which gave Ruff approximately twenty-five days to secure either employment or unemployment benefits.  Ruff contends this finding is unsupported by the evidence because no party presented evidence concerning the probability of either happening within the family court's timeline.  She also argues it is unfair because she has no control over either option.

We find the record supports the court's finding.  Ruff testified she worked all of Gabriel's life; she had never been fired from a job; she was unemployed at the time of trial because the company she worked for closed its office; and she was currently looking for employment.  Ruff also told the court she had been receiving unemployment benefits shortly before trial but was not currently receiving them because she had to re-file her paperwork.  However, she stated she intended to do so after the trial concluded.  Ruff's own testimony indicates it is reasonable for the court to expect her to either secure employment or unemployment benefits by January 31, 2011.  Accordingly, we affirm the family court's finding.

## 6.    Child Support

As to the finding that Ruff should pay $475.00 per month in child support, Ruff argues the court erred when it (1) imputed income to her at the amount she was paid before she became unemployed, (2) set the amount of child support, and (3) found she has been unemployed but has maintained the same level of income.

As to the first issue, "[i]f the court finds that a parent is voluntarily unemployed or underemployed, it should calculate child support based on a determination of potential income which would otherwise ordinarily be available to the parent." S.C. Code Ann. Regs. 114-4720(A)(5) (2012); *see also Patel*, 359 S.C. at 532, 599 S.E.2d at 123 ("It is proper to impute income to a party who is voluntarily unemployed or underemployed."). In calculating the amount of income to impute, "the court should determine the employment potential and probable earnings level of the parent based on that parent's recent work history, occupational qualifications, and prevailing job opportunities and earning levels in the community." Regs. 114-4720(A)(5)(B); *see also Sanderson v. Sanderson*, 391 S.C. 249, 256, 705 S.E.2d 65, 68 (Ct. App. 2010).

Ruff does not contend the court erred in imputing income to her but only that it imputed the incorrect amount; thus, we need not analyze whether the court's decision to impute income was proper. As to the amount of income imputed to her, the court made the following findings when it ruled:

> The Court finds that [Ruff] is able[-]bodied and capable of earning a living equal to her income prior to the beginning of this action. The Court finds that she has been employed almost the entire time litigation was pending and her income was relatively consistent, except for a short period of time prior to the trial of this case. Therefore, the Court finds it appropriate to impute income consistent with the income [she] enjoyed prior to losing her job. In finding that [Ruff] should have income imputed to her, this Court notes that [Ruff] changed jobs at least once during the pendency of this action with less than thirty (30) days in between positions. The Court further finds that without the litigation time constraint, and with [Gabriel] residing with [Nunez], [Ruff] should be able to obtain employment.

From its ruling, it appears the court took into consideration her employment potential and probable earning level based on her recent work history. Although Ruff was unemployed at the time of the hearing, she testified: (1) she had worked all of Gabriel's life; (2) she had been employed the last four and a half years; (3) she was unemployed at the time of trial because she was laid off; (4) she was currently capable of working; and (5) she was looking for a job. We believe this evidence supports the finding that Ruff is capable of working at the income level she enjoyed over the past four and a half years.

As to Ruff's argument that the court erred in setting the child support amount, she contends the family court simply echoed the income stated in the prior order because her financial declaration showed she could no longer pay child support. Because we find the court correctly imputed to Ruff the same income she previously made, we further find the court correctly based the amount of child support on this income.

### 7. Retroactive Child Support

The family court's order required Ruff to pay retroactive child support for a total of six months under the terms of the temporary order. The temporary order issued in 2009 (1) gave Ruff primary placement during the 2009-2010 school-year and child support in the amount of $340 per month, and (2) gave Nunez primary placement during June and July of 2009, with $475 per month in child support for those months. Ruff paid child support for June and July of 2009 but did not pay in 2010. Ruff claimed she tried to pay child support in 2010, but the court would not accept her payment because the language of the temporary order only required Ruff to pay for June and July of 2009. The family court ordered her to pay child support for those two months and also ordered her to pay child support for the fall of 2010 when Nunez had temporary custody due to Ruff's loss of custody in September 2010.

Ruff contends the temporary order issued in 2009 only contemplated payments for June and July of 2009, not 2010, so she should not have to pay retroactive child support for those months. Moreover, she argues the court did not order support for Gabriel during the fall of 2010 when it removed Gabriel from Ruff's custody; thus, Ruff should not have to pay retroactive support for those four months. We acknowledge the temporary order only required Ruff to pay child support for the summer of 2009, and the order removing Gabriel from Ruff's custody did not address the issue of child support. However, the family court's power to award retroactive child support depends on the facts and circumstances of each case,

*Sutton v. Sutton*, 291 S.C. 401, 408, 353 S.E.2d 884, 888 (Ct. App. 1987), and we believe the facts of this case warrant such an award. Nunez claims that because the docket was back-logged, he had custody of Gabriel during the summer of 2010. Thus, equity requires the temporary order's child support requirements to continue for that summer, notwithstanding the fact that the order only contemplated payment for one summer. And for the same reasons, the parties should have continued to pay child support during the following school year as well, meaning Nunez would have owed Ruff child support for the 2010 school year. However, Ruff lost custody of Gabriel due to her willful contempt of court, so it became Ruff's responsibility to pay child support. For these reasons, the court correctly found Ruff owed child support for the summer and fall of 2010.

Ruff also argues that because the court did not order Nunez to pay retroactive support when he went to New Jersey for two months in March 2009 and left her without support, any back child support due from her should be offset against any support Nunez should have paid to Ruff during that time. When Nunez went to New Jersey in 2009, however, the support agreement in effect at the time did not provide for any child support payments. Because child support payments were not contemplated by the parties at that time, we deny Ruff's request to offset her retroactive child support.

As to Ruff's remaining arguments on this issue, we find they are not preserved for our appellate review because Ruff did not argue them to the family court or in her Rule 59(e), SCRCP, motion to alter or amend. *See Marchant v. Marchant*, 390 S.C. 1, 7, 699 S.E.2d 708, 711 (Ct. App. 2010) ("A point not raised to and ruled upon by the family court will not be considered on appeal.").

### 8. Uncovered Medical Expenses

The family court ordered the parties to divide all of Gabriel's uncovered medical expenses evenly. Ruff contends the family court failed to follow the law of South Carolina in ordering her to pay half of the uninsured medical bills, but she did not specify which law the family court failed to follow and cites no authority to support her argument. We find Ruff abandoned this argument on appeal. *See Judy v. Judy*, 384 S.C. 634, 644, 682 S.E.2d 836, 841 (Ct. App. 2009) (holding appellant abandoned issue on appeal because no legal authority cited to support argument).

### 9. Outstanding Medical Bills

At the time of trial, the court found there were outstanding medical expenses totaling $190. Additionally, the court found Ruff had previously paid $143 in outstanding medical bills, while Nunez had paid only $95. After concluding that "medical bill reimbursements have been a substantial problem in this case" and that Nunez offered credible testimony regarding the payments of medical expenses and reimbursements, the court ordered Nunez to reimburse Ruff $48 within ninety days of the order.

Ruff argues the findings stated above are unsupported by evidence in the record. Although Ruff appeals this issue, Ruff's entire argument on this point consists of the following:

> As to the outstanding medical bills, there was no testimony or evidence as to the exact amount owed by one party to the other, except that [Ruff] testified that the amount is "less than three hundred dollars." This finding by the Court is simply not supported by any evidence of record whatsoever.

Ruff only argues the finding is not supported by the evidence and does not assert she is owed more than $48 or request we remand the issue to the family court. If we were to agree with her argument, we would vacate the award due to the lack of evidence supporting the findings. However, in light of the fact that (1) Ruff is the party appealing this issue; (2) the record contains evidence that there were problems with Nunez reimbursing Ruff for medical expenses; (3) Ruff testified she was owed "less than three hundred dollars;" (4) the court made detailed findings of medical expenses, with the figures including cent values, and (5) the court explicitly stated it made these findings "after reviewing the exhibits" and testimony presented at trial, we believe the evidence, exhibits, and testimony—in the totality of what the court considered—is sufficient to affirm the court's ruling on this issue. Thus, we affirm the award.

### 10. Telephone Contact

The order set a phone schedule that required the party with physical placement to provide a minimum of one call per week from Gabriel to the party without physical placement. Ruff argues "the telephone contact allowed—one telephone call per week—is so restrictive . . . and so unfair" that it is meaningless. Moreover, she

contends the one call per week schedule will only serve to limit her contact with Gabriel, "as it has been proven during the course of this litigation that [Nunez] will not cooperate in allowing even Court-ordered telephone and Skype visitation, much less allow extra 'agreed-upon' visitation."

Initially, we note Ruff mischaracterizes the court's order. The one call per week is merely a minimum of what the party with physical placement must provide to the other party. In fact, the order (1) encourages "free and reasonable telephone access" for the party without physical placement, (2) promotes the use of "other forms of communication" so that the party may "enjoy a close and loving relationship with [Gabriel] while they are apart," and (3) requires both parties to make reasonable arrangements to allow Gabriel to talk "on a more frequent basis as" the parties' schedules allow. We find phone schedule reasonable and affirm.

### 11. Medical Decisions

Ruff argues the finding that Nunez shall make all medical decisions related to Gabriel is against the greater weight of the evidence and could prove "disastrous" for Gabriel. In support for her argument, she contends Nunez took Gabriel off his ADHD medication in violation of two court orders; he did not appear at either contempt hearing regarding this violation; and he exhibited denial of Gabriel's diagnosis. Moreover, she asserts the court did not consider (1) her own testimony and the GAL's testimony that showed it was Ruff who took appropriate care of Gabriel's medical and therapy needs, and (2) testimony that showed Gabriel's behavior improved while in her custody but regressed while in Nunez's custody.

We believe allowing Nunez to make all medical decisions is in Gabriel's best interest because it provides a clear chain of command regarding Gabriel's medical needs. Moreover, we are not persuaded that this will prove "disastrous" for Gabriel. The record shows Nunez was uncertain Gabriel needed to be treated with medication, so he had Gabriel reevaluated, which required him to be taken off his medications. Once a physician recommended the medication be maintained, Nunez followed the doctor's recommendations. Nunez testified he has informed himself about the disorder and the effects of the medications, as well as researched other non-medicinal techniques for dealing with the disorder. Based on this evidence, the court determined Nunez's decisions regarding Gabriel's ADHD medications were reasonable because he "exhibited sincere concern" and has "gone to extraordinary lengths" to assure Gabriel received appropriate medical care. We affirm the court's ruling because the facts were in dispute and the court was in the

best position to determine the credibility of the witnesses and weigh the evidence presented by the parties.

Additionally, Ruff contends the family court erred in not addressing Gabriel's ADHD and ODD. She argues that despite the GAL's conclusion that Gabriel's ADHD medications and ODD counseling must be addressed in the final order, the order failed to make findings and conclusions as to this issue. We do not believe, however, that the family court was in any position to assume the role of a physician and give directives as it relates to Gabriel's medical treatment. The court determined Nunez's actions relating to Gabriel's medical treatment were reasonable and granted him the authority to make all the decisions regarding his medical treatment in the future. We believe this sufficiently "address[ed] Gabriel's diagnosed ADHD and ODD."

### 12.    Guardian Ad Litem's Fee

Ruff argues the court's finding that she should be required to pay the entire GAL's fee is not supported by the evidence presented at trial. "An award of guardian ad litem fees lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion." *Shirley*, 342 S.C. at 341, 536 S.E.2d at 436. The same equitable considerations that apply to attorney's fees also apply to GAL's fees. *Garris v. McDuffie*, 288 S.C. 637, 644, 344 S.E.2d 186, 191 (Ct. App. 1986). A family court must first consider the following factors in determining whether to award GAL's fees: "(1) each party's ability to pay his or her own fee; (2) the beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) the effect of the fee on each party's standard of living." *Farmer v. Farmer*, 388 S.C. 50, 57, 694 S.E.2d 47, 51 (Ct. App. 2010). After deciding to award GAL's fees, a family court must then consider the following factors in deciding how much to award: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services." *Id.*

In requiring Ruff to pay the GAL's fee in full, which amounted to approximately $10,000, the court stated:

> The Court finds that the length of time this matter was
> pending is a direct result of [Ruff]'s actions. The court
> finds that [Ruff] was unsuccessful in her action as it
> relates to a substantial change of circumstance and the

Court finds that [her] behavior resulted in a substantial balance due to the Guardian ad Litem. This Court finds that [Ruff] should pay the Guardian's Fees in full. [R]uff shall be responsible for the outstanding balance of $7,864 due to the Guardian. [R]uff shall reimburse [Nunez] $2,256 for the payments he has made to the Guardian.

. . .

In considering the allocation of the Guardian Fees, the Court will note that it is not awarding attorney fees and costs to either party. The Court finds that while [Nunez] was the prevailing party, and acted reasonably during the course of this litigation, and had [Ruff] conducted herself similarly, neither party would have the substantial attorney fees and costs or the substantial Guardian fees set forth above.

We acknowledge the court did not delineate its consideration of the factors in ordering Ruff to pay the GAL's fees. However, an appellate court may, "where the record is sufficient, make its own findings of fact in accordance with the preponderance of the evidence." *Thomson v. Thomson*, 377 S.C. 613, 623, 661 S.E.2d 130, 135 (Ct. App. 2008) (citation omitted); s*ee also Farmer*, 388 S.C. at 57-58, 694 S.E.2d at 51 (affirming an award of attorney's fees based on its own findings of fact because the family court did not explicitly consider all the factors in making the award). In doing so, we are not required to disregard the findings of the family court, particularly those relating to credibility. *See Pirayesh*, 359 S.C. at 292, 596 S.E.2d at 510.

Giving deference to the family court's findings and credibility determinations, we affirm the decision. The order provided many examples of how Ruff's behavior caused the GAL's fee to be substantial, including (1) Ruff's violations of the temporary order, which caused her to lose custody of Gabriel, (2) the finding that Ruff's actions relating to Gabriel were "self-serving and for the purpose of gaining an advantage" in the custody action, (3) the finding that Ruff used the issue of medication to discredit Nunez and "sway the Guardian to support her action," (4) the finding that Ruff refused to allow visitation during the pendency of the action, (5) the finding that Ruff "chose to interpret the Order to her advantage rather than making decisions that would be in the child's best interest," (6) the finding that she has not cooperated in having prescriptions filled and paying medical bills, and (7)

the finding that "she has frustrated [Nunez]'s attempts to seek second opinions and advice from medical professionals."  Additionally, the court awarded only the GAL's fee and did not award attorney's fees or additional costs.  The family court has broad discretion when determining the amount of costs to award.  *Farmer*, 388 S.C. at 57, 694 S.E.2d at 50.  In light of this fact and for the reasons described above, we affirm the award and find the family court did not abuse its discretion.

##### V. Conclusion

For the reasons stated above, we affirm the court's findings and legal conclusions related to custody, modify the findings related to Ruff's Christmas and spring break visitations, and affirm the other findings and legal conclusions of the court.

**AFFIRMED IN PART AND MODIFIED IN PART.[4]**

**FEW, C.J., GEATHERS and LOCKEMY, JJ., concur.**

---

[4] We decided this case without oral argument pursuant to Rule 240, SCACR.